# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

ACADEMY OF ALLERGY & ASTHMA §
IN PRIMARY CARE, UNITED §
BIOLOGICS, LLC D/B/A UNITED §
ALLERGY SERVICES, §
§
      **Plaintiffs,** §     **Case No. _____**
§
**v.** §     **JURY DEMAND**
§
AMERIGROUP TENNESSEE, INC. §
d/b/a AMERIGROUP COMMUNITY §
CARE; BLUECROSS BLUESHIELD OF §
TENNESSEE, INC.; VOLUNTEER §
STATE HEALTH PLAN, INC., d/b/a §
BLUECARE TENNESSEE; §
PHYSICIANS' MEDICAL §
ENTERPRISES, LLC d/b/a PME §
COMMUNICATIONS; ALLERGY §
ASSOCIATES, P.A. d/b/a THE §
ALLERGY, ASTHMA AND SINUS §
CENTER, P.C.; AND NED DELOZIER §
§
      **Defendants.** §

## COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services, (collectively, "Plaintiffs") file this Complaint against Amerigroup Tennessee Inc. d/b/a Amerigroup Community Care ("Amerigroup"), BlueCross BlueShield of Tennessee, Inc. ("BCBST"), Volunteer State Health Plan, Inc., d/b/a BlueCare Tennessee ("BlueCare"); Physicians' Medical Enterprises LLC d/b/a PME Communications, LLC ("PME"), Allergy Associates, P.A. d/b/a The Allergy, Asthma and Sinus Center, P.C. ("AASC"), and Ned DeLozier (collectively, "Defendants"), and would respectfully show the Court the following:

# I.  NATURE OF CASE

1.  This case concerns a conspiracy among the largest health insurance company in Tennessee, BCBST, two of the State's three managed care organizations, Amerigroup and BlueCare, and the largest provider of allergy care in the State, AASC, to unlawfully restrict the sources of allergy testing and immunotherapy in markets throughout the State of Tennessee. The agreement among these entities, and those acting illegally on their behalf such as PME and Ned DeLozier, includes limiting allergy skin testing and allergen immunotherapy services to the businesses of board-certified allergists, thereby benefitting the business of AASC, PME, and DeLozier and limiting the reimbursement exposure of Amerigroup, BCBST, and BlueCare.  These parties have attempted to limit competition by directly harassing and intimidating primary care providers to prevent their participation in the allergy skin testing and immunotherapy market, convincing providers to deny relationships to UAS that are necessary to compete in the market, and price fixing among the MCOs that would limit competition traditionally occurring among network providers.  This boycott and price fixing activity among Defendants is designed to exclude the offering of allergy care at the primary care level by excluding the necessary components of those services and by threatening anyone who participates in such an offering.

2.  As a result of Defendants' conduct, numerous patients who otherwise would be treated for allergies with allergy testing and immunotherapy are forced to go without treatment, and the few who are able to obtain treatment spend more money to do so.  Meanwhile, Amerigroup and BlueCare pocket the difference in government funds, and AASC is able to protect its domination of the allergy markets in Tennessee. Defendants' internal admissions indicate not only a conscious commitment to this unlawful scheme, but additional efforts by each of them to cover it up, including taking steps to evade government and regulatory scrutiny at every turn.

## II. PARTIES

3.     Plaintiff AAAPC is a 503(c)(6) non-profit organization of physicians with its principal place of business in Washington, the District of Columbia. AAAPC represents the interests of over 30 primary care physicians who practice allergy testing and allergen immunotherapy in Tennessee and hundreds of primary care physicians nationwide. AAAPC has standing to request declaratory and injunctive relief to protect the interests of its members, who would have standing to sue individually, but are not necessary parties to this suit. AAAPC appears here through undersigned counsel of record. Through this action, AAAPC seeks to protect interests that are germane to its purpose as an organization.

4.     Plaintiff United Biologics, LLC d/b/a United Allergy Services ("UAS") is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas. UAS provides technical services in conjunction with physicians who provide professional services in the delivery of allergy testing and immunotherapy to consumers nationwide including in Tennessee. As a result, UAS and the primary care and other health care providers UAS supports, compete directly with businesses such as AASC, which generally dominated all markets for allergy testing and allergen immunotherapy prior to UAS's launch in 2009. As a direct target and victim of Defendants' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek damages and injunctive relief under the Clayton Act in addition to standing for its other claims. UAS appears here through undersigned counsel of record.

5.     Defendant Amerigroup Tennessee Inc. d/b/a Amerigroup Community Care ("Amerigroup") is a Tennessee corporation with its principal place of business at 22 Century Blvd., Suite 220, Nashville, Tennessee 37214-3787. Amerigroup's registered agent for service is CT

Corporation System and may be served at 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710. Amerigroup is a health insurance and managed healthcare contractor that is authorized to arrange for the provision and reimbursement of healthcare services to patients enrolled in Tennessee's Medicaid program, TennCare.

6. Defendant BlueCross BlueShield of Tennessee, Inc. ("BCBST" or "BlueCare") is a Tennessee corporation with its principal place of business at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402-9815. BCBST is a for-profit health insurance company that is by far the largest such entity in Tennessee, providing coverage to over 3.5 million members, including commercial and governmental health insurance products. For example, BCBST has approximately 71% market share of the large group market in Tennessee and has the ability to price its products, reduce coverage, and pay significantly lower rates to providers without any appreciable effect on its market share or sales to consumers and employers. BCBST's registered agent for service is Anne Hance and may be served at BCBST's principal office.

7. Volunteer State Health Plan, Inc., d/b/a BlueCare Tennessee ("BlueCare") is the wholly owned subsidiary of BCBST and a health insurance and managed healthcare contractor that is authorized to arrange for the provision and reimbursement of healthcare services to patients enrolled in Tennessee's Medicaid program, TennCare. BlueCare's registered agent for service is Anne Hance and may be served at BCBST's principal office.

8. Defendant Physicians Medical Enterprises d/b/a PME Communications, LLC ("PME") is a Tennessee limited liability company with its principal place of business at 6701 Baum Drive, Suite 140, Knoxville, Tennessee 37919-7361. PME's registered agent for service is Frances Prince-DeLozier and may be served at PME's principal office.

4

9. Defendant Allergy Associates, P.A. d/b/a The Allergy, Asthma and Sinus Center, P.C. ("AASC") is a Tennessee corporation with its principal place of business at 6701 Baum Drive, Suite 140, Knoxville, Tennessee 37919-7361. AASC's registered agent for service is Robert M. Overholt, M.D. and may be served at AASC's principal place of business.

10. Ned DeLozier is an individual, who is also the Business Development Director and Executive for PME, the management company for AASC, and may be served at 6701 Baum Drive, Suite 140, Knoxville, Tennessee 37919-7361, PME's principal place of business.

## III. JURISDICTION AND VENUE

11. This action is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the United States Constitution, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, the Clayton Act, 15 U.S.C. §§ 15 and 26, and the common law actions for tortious interference with business relations or advantage and civil conspiracy.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV. FACTUAL BACKGROUND

### The Markets for Allergy Testing and Immunotherapy

14. This case centers on coordinated efforts by Defendants to restrict competition in the markets for allergy testing and immunotherapy by restricting output of those services in Tennessee to the businesses of board-certified allergists such as AASC. Allergy testing and immunotherapy are services for which demand already greatly exceeds output in markets in Tennessee. The lack

5

of sufficient output for these services is significant because the only known method of actually treating allergic rhinitis is allergen immunotherapy, which can only be performed after a patient has been tested for allergies.

15. Established literature estimates that currently 30-40% of the United States population are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States. Those same studies show only 2-6% of the population receive immunotherapy, a treatment that actually treats the underlying cause, unlike pharmacopeia and other drugs which merely mask a patient's symptoms. A significant factor in this market need is that the number of sources of output for allergy testing and immunotherapy is lacking due to numerous and high barriers to entry.

16. The barriers to entry for allergy testing and immunotherapy include numerous technical and economic elements including certain relationships needed in the competitive struggle. For firms to offer these services, they must have access to a physician who may provide the medical component of the services, a trained technician acting incident to the provider in providing the services, expensive equipment and products including testing devices, FDA-approved antigens and diluents, and reimbursement from health insurance companies who largely pay for the services.

17. Because of these high barriers to entry, most of the sources of output for these services in Tennessee are businesses such as AASC that are associated with "board-certified allergists," or physicians who have been certified to have completed a fellowship in training by the American Board of Allergy and Immunology ("ABAI"), a private organization established in 1971. Physicians who participate in that fellowship specialize in high-risk allergic and asthmatic conditions far beyond the complexity of the average patient with allergic rhinitis. And while most board-certified allergists also participate in the offering of allergy testing and immunotherapy services, no governmental authority has ever adopted the private ABAI certification as a

6

requirement of participation. In fact, in 1989, the United States Department of Health and Human Services ("HHS") expressly rejected such a proposal in relation to allergy testing and immunotherapy covered by the Centers for Medicare and Medicaid Services, directing that such services are often provided by family physicians and those under their supervision and should not be so restricted.

18.   Nevertheless, for many years AASC has dominated most markets for allergy testing and immunotherapy in Tennessee. AASC has historically been and is still the largest provider of allergy testing and immunotherapy services in the State of Tennessee. Its nearly 30 Tennessee locations include six offices in the Knoxville area, as well as offices in the following geographic markets: Athens, Clarksville, Columbia, Cookeville, Crossville, Franklin, Greeneville, Harriman, Hendersonville, Hermitage, Johnson City, Lawrenceburg, Lenoir City, Madisonville, Maryville, McMinnville, Morristown, Mt. Juliet, Oak Ridge, Sevierville, Spring Hill, West Nashville, and White House. In fact, in almost every geographic market in Tennessee, AASC controls more than 70% of the allergy testing and immunotherapy services performed in those local areas.

**Plaintiffs Increase Competition in the Market, Drawing Defendants' Backlash**

19.   Since 2009, a new class of competitors began expanding competition in providing allergy testing and immunotherapy services to patients in the relevant markets. One such competitor, Plaintiff United Biologics, LLC, was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL," now currently doing business under the name "United Allergy Services" or "UAS."  UAS's business model represented a competitive response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services, especially in areas like Tennessee. Though some family physicians and other primary care physicians practiced allergy testing and allergen

7

immunotherapy, most did not, based on the large economic barrier to entry into the market. Providers must purchase and stock the necessary allergy testing equipment and antigens for immunotherapy, as well as train and maintain technicians to assist in administering tests and preparing immunotherapy. These expenses normally prevent most primary care practices from providing allergy testing and allergen immunotherapy. UAS was formed to help primary care physicians and their businesses overcome these economic and technical barriers by contracting with those physicians to assist those physicians' entry into the market, along with UAS's.

20. UAS contracts with medical practices, including those who employ primary care and family physicians, to provide the equipment and non-physician technician services necessary to facilitate the treatment of allergy skin testing and immunotherapy in a cost-effective manner. In exchange for these services, the provider pays UAS a set fee. Since 2009, UAS technicians and more than 2,000 primary care physicians have jointly provided allergy testing and allergen immunotherapy across 29 states. In Tennessee, UAS has contracted with over 80 primary care physicians and other providers or medical practices to enable the offering of allergy testing and immunotherapy at their locations to treat patients for seasonal and perennial allergies. Many of these providers work in rural areas and provided a necessary service that was not possible without UAS's assistance. Certain providers offer medical services in such rural counties that the nearest board-certified allergist is many miles away and beyond the distance most consumers will travel for those services.

21. When a provider works with UAS—overcoming the barriers of entry into the market for allergy testing and allergen immunotherapy—that provider is able to treat his or her patients more effectively. The only known potential cure of allergic rhinitis for seasonal and perennial allergies

is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens.

22. Providers who render care through allergen immunotherapy first test the patient for allergies through use of a skin prick test or an allergy blood test. Before the entry of UAS into the market, primary care physicians often would refer patients with seasonal and perennial allergies to reference laboratories for allergy blood testing or to board-certified allergists for allergy skin prick testing and immunotherapy. With the assistance of UAS, however, such providers began utilizing the skin prick test in their own offices, removing the referral to reference laboratories for allergy blood tests and board-certified allergists for allergy skin prick tests. This cost-effective and accessible system for patients threatened these competitors' referral networks and caused third-party payors, like Amerigroup and BCBST, to pay more upfront in preventative medicine and claims for reimbursement by reaching far more patients than board-certified allergists could in their respective markets.

23. To compete in the relevant markets for allergy testing and allergen immunotherapy, allergy services companies like UAS and related businesses rely on physicians licensed to practice medicine in Tennessee, technicians for which there is no licensing requirement, and other employees, who either administer or participate in the testing or immunotherapy preparation. The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, needles, instruments, and other materials necessary to perform allergy testing and preparation of allergen immunotherapy. The firms must also be paid for the services performed, namely by the medical practice, which is often reimbursed for testing and treatment of the patient by a "third-party payor," such as a commercial health insurance company, a managed care health plan, Medicare, or Medicaid. Approximately 98% of the services for allergy testing and allergen

9

immunotherapy are paid for at least in part by third-party payors, and these services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association. Because Medicaid, which is administered by the Bureau of TennCare, concerns Covered Services guaranteed by CMS, 100% of those services are paid by MCOs that contract with TennCare, including Amerigroup and BlueCare. Without reimbursement from payors like Amerigroup or BlueCare, services such as allergy testing and immunotherapy cannot be made available to most consumers.

24. Through their control over the source of funds for Covered Services, MCOs like Amerigroup and BlueCare, as well as commercial payors such as BCBST, have the ability to coerce those who seek to supply such services, as third-party payor reimbursement is a necessary element to offering health care beyond even just allergy care. Medical practices and physicians in general are vulnerable to coercion, especially when they offer a wide array of reimbursable services. In this case especially, UAS often contracts with family physicians, primary care physicians, and pediatricians who offer myriad services and cannot risk losing their contract with payors, like Amerigroup, BlueCare, and BCBST, for all of the services they provide. Losing a contract with these large payors could shut down a physician's entire practice. When physicians receive claims denials, are audited or investigated by a payor, or even kicked out of a payor's network, physicians are less likely to offer the questioned service in order to protect their broader practice.

25. Currently, there is no substitute for either allergy testing or allergen immunotherapy in effectively diagnosing or treating seasonal or perennial allergies. While over-the-counter and prescription allergy medications provide masking of symptoms, unlike immunotherapy, they fail

to address the underlying cause of allergic rhinitis for seasonal and perennial allergies. During the diagnosis of a patient with seasonal and perennial allergies, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test. If the patient consents, the skin prick test is typically applied by a technician to the patient's skin under the physician's supervision. After approximately 15 minutes, reactions on the skin are measured and recorded by the technician. The physician or a duly designated physician assistant or nurse practitioner then reads and interprets the results to determine, in his or her professional medical judgment, whether the patient has tested positive to a clinically relevant allergen. The physician's professional determination as to whether the patient is allergic not only involves reviewing and interpreting the test, but also incorporates the physician's prior physical examination of the patient and review of the patient's clinical history. In performing this service, physicians submit claims for reimbursement to insurance companies and MCOs under CPT Code 95004.

26. Allergy testing, through either a skin test or a blood test is a prerequisite for a patient to be considered for allergen immunotherapy. When a physician determines that a patient has tested positive for clinically relevant antigens, the physician considers whether to prescribe professional services related to allergen immunotherapy for that patient. In determining whether to prescribe immunotherapy, the physician assesses whether the patient would benefit from allergen immunotherapy, considers whether the benefit exceeds any inherent risk of treatment, and evaluates whether prior efforts at pharmacological management or avoidance have failed to adequately control the patient's symptoms. The physician also consults with the patient regarding the potential benefits and risks associated with immunotherapy. If the patient elects to proceed with immunotherapy, the physician will obtain the patient's written consent before prescribing the

allergen immunotherapy preparation. The physician then supervises the preparation and administration of the allergen immunotherapy, an incident-to, technical service that the technician performs under the physician's supervision, which includes the combination of FDA-approved antigens in vials and serial dilutions of those vials. In performing the professional service related to allergen immunotherapy, the physician submits claims for reimbursement to insurance companies and MCOs under CPT Code 95165.

27.   The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or allergy shots.  If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician.  Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance and lower costs that are associated with self-administration.  Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases.  Self-administration is a safe and effective method for certain patients and is also less expensive because the patient and their insurer are not billed for shot administrations that the patient self-administers.  Further, the patient does not have to travel to the physician's office every week, let alone two to three times a week, for immunotherapy treatments lasting for one to three years.   Additionally, HHS has acknowledged that self-administration of immunotherapy is an appropriate form of treatment.

28.   Given travel cost and time considerations for the treatment of seasonal and perennial allergies, there is a limit to how far patients will travel for allergy testing and allergen

immunotherapy.  The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, tends to be relatively localized.  Allergy treatment services are offered in all major cities in the country and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health care services, including allergy testing and allergen immunotherapy, close to their homes and workplaces.  Localized areas where patients travel for such services is commonly determined based on Core-Based Statistical Areas ("CBSAs").  A CBSA reflects the economic reality of where these services are received. It is not usually economically feasible for a patient to travel to another CBSA for non-ambulatory services such as allergy testing and allergen immunotherapy given the economic tangible and intangible costs involved with such travel. For the allergy services at issue and based on CMS's guidelines for travel concerning non-ambulatory services for Medicaid patients of this type, patients are highly unlikely to seek treatment over 15 miles from their nearest provider. This geographic limitation is made all the more meaningful in the specific services market at issue because allergen immunotherapy protocols provided by board-certified allergists usually require in-office visits 2 to 3 times per week for several years. Thus, a patient in Knoxville is highly unlikely to travel to Nashville or even Cookeville just to obtain an allergy test or allergen immunotherapy numerous times per week for several years.

29.  These issues are compounded when considering that even when consumers are able to travel considerable distances for the pertinent services, they would face not only the additional travel distance and related costs (e.g., gas, time off of work and school), but also longer wait times for an appointment with a board-certified allergist than they would for a primary care provider, as

well as longer wait times in the offices of a board-certified allergist as opposed to a primary care provider. And while the market may be local, Defendants' actions are aimed at foreclosing an entire class of competitors, and Defendants have attempted to impact localized markets in which they do business, including each of the localized markets in Tennessee.

30. These markets include localized markets in the area surrounding Cookeville, for which AASC and Plaintiffs are the only sources of output. For example, UAS and primary care provider Kids Kare jointly offer allergy testing and immunotherapy services in that market in direct competition with AASC, which until recently was the only source of output in that area. AASC has thus engaged in the tortious conduct complained of herein to run Plaintiffs out of that market and to regain its monopoly. Similar issues persist in localized markets throughout the State as, absent competition from primary care providers in contract with UAS, AASC possesses dominant market power statewide.

**UAS Increases Competition in the Allergy Testing and Immunotherapy Markets**

31. UAS's entry into the marketplace marked an increase in competition in markets nationwide, including in Tennessee, taking market share from its competitors, such as board-certified allergists. UAS began contracting with providers in Tennessee in 2013 and, as discussed in detail below, Defendants took notice, ultimately agreeing to work together to prevent Plaintiffs from participating in the market.

32. UAS's contracting physicians in Tennessee are board-certified family physicians, pediatricians, nurse practitioners, and their business practices who provide health care to members of their respective communities in Tennessee within the scope of their medical licenses. Working together, UAS and their contracting physicians provide a bundled service that enables participation in the markets for allergy testing and immunotherapy—the physicians rely upon their medical

expertise to provide the necessary professional services, while UAS provides the technical services and equipment.

33. Many of the patients for which these physicians care are participants in the TennCare program, including TennCare members covered by one of three MCOs: Amerigroup, BlueCare, or United Healthcare ("UHC"), formerly referred to as AmeriChoice. As family physicians and primary health care providers, UAS-contracting physicians provide all of their patients important preventive and primary care services, including allergy care consisting of allergy testing and, if warranted, allergen immunotherapy. In 1989, HHS explicitly found that allergy testing and immunotherapy services are within the scope of practice of primary care physicians. As defined by that authority, UAS contracting physicians may provide those services when assisted by auxiliary personnel acting under their direct supervision.

**AASC and Amerigroup Agree to Run UAS and Primary Care Physicians Out of the Market in Violation of Federal and State Laws and Regulations**

34. Allergy skin testing and allergen immunotherapy both are covered benefits under CMS programs such as TennCare. Under the terms of those programs and the MCO's Provider Service Agreements, Amerigroup and BlueCare are contractually obligated to reimburse primary care physicians for all claims that they submit related to the "professional services" billed under 95004 and 95165 and that are provided in accordance with their Provider Service Agreements. And Amerigroup and BlueCare did pay claims submitted under these two codes by primary care physicians contracting with UAS for years without issue.

35. In 2016, however, Amerigroup began communicating with those acting on behalf of board-certified allergists, including Ned DeLozier, who was at all times acting on behalf of PME and AASC. Since family physicians and pediatricians began offering allergy testing and immunotherapy services in conjunction with UAS, AASC has been losing patients and revenue to

those physicians. In other words, these UAS-contracting physicians, who once were sources of referrals for AASC, became competitors in the market. Consequently, AASC and PME, including Ned DeLozier, had a great interest in driving these physicians and UAS out of this market. Various efforts to do so over the years have failed, so Ned DeLozier, acting on behalf of AASC, decided to reach out to Amerigroup to see if they could agree to work together to drive these new competitors out of the allergy services market.

36.   In September 2015, Mr. DeLozier initially reached out to Amerigroup by contacting its medical director, Dr. Mark Mahler, regarding the increase in providers rendering allergy care to TennCare patients for which Amerigroup was reimbursing. Mr. DeLozier met Dr. Mahler at meetings for the Tennessee Asthma Coalition held for industry stakeholders, including Amerigroup and AASC. Following these communications with other competitors and industry stakeholders at these consortium meetings, Mr. DeLozier and Dr. Mahler agreed to meet privately to discuss their mutual interest in shutting down this increased competition resulting from the rise in primary care physicians offering allergy testing and immunotherapy.

37.   Mr. DeLozier followed up their initial meeting by emailing Dr. Mahler on January 22, 2016, warning Amerigroup that it should be wary "of medically unnecessary allergy diagnostics and treatment being performed by primary care providers in TN" in order to demonstrate to Amerigroup that primary care physicians were not qualified to offer such services because they were not board-certified allergists. Amerigroup was interested in Mr. DeLozier's proposal because it wanted to find a way to reduce the influx of claims from primary care providers offering these services but could not deny claims based on the scope of their license.

38.   Following this, Mr. DeLozier dropped off documents for Dr. Mahler in person on January 29, 2016, rather than via email, in an intentional effort to avoid a traceable paper trail. Dr. Mahler

agreed to investigate the matter and forwarded the information he received from Mr. DeLozier to Amerigroup's special investigative unit ("SIU"), noting that Mr. DeLozier represented a "large and well respected group of allergists in TN" and requesting that SIU keep Dr. Mahler in loop on how he could "help support the elimination of inappropriate allergy services in our network."

39.   Following these initial communications, AASC and Amerigroup came to an agreement to work together to restrict allergy care to board-certified allergists by investigating and eventually shutting off reimbursement to any provider who was in contract with UAS using the justification that they were not allergists, but in reality because they competed with AASC and were submitting claims for reimbursement to Amerigroup.   The plan was that Mr. DeLozier and the AASC board-certified allergists would provide Amerigroup with information on which Amerigroup could claim to justifiably rely in denying valid claims from primary care physicians who contracted with UAS. At this time, Amerigroup and Mr. DeLozier were aware that UAS was providing auxiliary personnel to assist physicians by performing incident-to services under the physician's supervision, such as applying a skin prick test to the skin, handling paperwork and documentation, and physically combining and diluting antigens in serial dilution vials necessary for immunotherapy.   Such technician services provided by such auxiliary personnel are a necessary aspect of the allergy testing and immunotherapy product and are utilized in the same way by board-certified allergists.   Yet, AASC convinced Amerigroup to limit its exposure to claims for the allergy services provided by primary care physicians by refusing to reimburse those physicians for such services based on any pretext Amerigroup could develop.

40.   By May 2016, Mr. DeLozier had established himself as the go-to resource for Amerigroup for obtaining false and misleading information about primary care physicians contracting with UAS. From 2016 through the present, Mr. DeLozier had numerous in-person meetings, emails and

telephone calls with Amerigroup investigators and representatives, including Amerigroup medical director Dr. Mahler, Senior Fraud Investigator John Taylor—among other investigators at Amerigroup, Amerigroup's in-house counsel Laura Schmidt, and the National Medical Director for Reimbursement of Amerigroup's parent company, Anthem, Inc., Dr. Priscilla Alfaro. Based on the information provided by Mr. DeLozier, Amerigroup eventually decided to target primary care physicians contracting with UAS for wholesale denial of their allergy claims.

41. In May 2016, Amerigroup communicated internally with Dr. Alfaro about developing such a pretext. Dr. Alfaro continued communicating with investigators and other leaders at Amerigroup regarding its investigation and reimbursement of primary care providers in contract with UAS. Following these communications, John Taylor communicated with Courtney Pearre, Vice President of Government Relations, that Taylor had spoken to Dr. Alfaro regarding primary care physicians practicing allergy testing and allergen immunotherapy and that she was "extremely knowledgeable regarding immunotherapy."

**Amerigroup Moves Forward with the Agreement**

42. In June 2016—after Dr. Mahler and Ned DeLozier's many meetings about excluding primary care physicians from the market, and after Mr. Taylor's conversation with Dr. Alfaro about formulating any basis to restrict coverage to specialists—Amerigroup secretly opened an "investigation" of both UAS and the first of the then-known primary care physicians who were providing allergy testing and immunotherapy to their patients, Dr. Christopher Sewell. As Amerigroup has stated in internal documents, these investigations originated because Amerigroup was interested in limiting its financial exposure resulting from the spike in amounts that it was paying out in reimbursement for allergy testing and immunotherapy. And by August 2016, while Amerigroup had commenced denying claims that primary care physicians submitted for allergy

testing and allergen immunotherapy, Amerigroup began to focus specifically on eliminating UAS from the market. For example, Mr. Taylor told the Manager of the SIU at Amerigroup that Dr. Mahler "wanted to be a part of any future meetings/discussions regarding UA [United Allergy] and 95165."

43. Amerigroup decided that because primary care providers were in contract with UAS, which facilitated a technical and economic component of competition in the market, Amerigroup would find ways to break that relationship and run these competitors out of the market. Amerigroup thus determined it would stop reimbursement for all allergy claims on any basis it could find—and communicated with others to encourage them to stop reimbursement too.

**Amerigroup Realizes it Needs its Competitors and Continually Works to Induce its Competitor MCOs to Join the Conspiracy to Coerce Plaintiffs out of the Market**

44. By September 2016, Amerigroup began communicating with its competitors, including UHC and BCBST, through TennCare Office of Program Integrity ("OPI") meetings and beyond to convince them to restrict reimbursement for the pertinent allergy services to board-certified allergists. Amerigroup knew that if it convinced TennCare and other MCOs to restrict reimbursement to board-certified allergists, it would successfully eliminate primary care physicians from the market—reducing Amerigroup's payment of claims substantially.

45. Amerigroup investigators, including Mr. Taylor, also participated in monthly coordination calls with UHC and BCBST beginning in that time and spanning through the present. During these calls, investigators from each of these competitor MCOs illegally shared pricing policy information and disclosed comprehensive details about investigations conducted by the respective MCOs aimed at cutting off reimbursement to primary care providers, including disclosing the specific names of the providers being investigated in contract with UAS. The investigators then encouraged their competitors to conduct their own investigations and to limit or shut off

reimbursement to these providers. For example, in both September and October 2016, Mr. Taylor discussed and shared details of Amerigroup's investigation of primary care physicians contracting with UAS, as well as Amerigroup's subsequent reimbursement decisions, with UHC and BCBST.

46. Following the September 2016 call discussing primary care providers in contract with UAS, Amerigroup conducted its own internal coordination conference call with Amerigroup representatives from SIU and compliance, including investigators from Amerigroup Texas. They discussed allergy testing and allergen immunotherapy and what they called "third party contractors," or companies like UAS.

47. In addition to these monthly coordination calls, Amerigroup and its competitors also held health care fraud working group meetings several times a year that served the similar purpose of sharing information about certain providers with their competitors. And again in September 2016, BlueCare and BCBST hosted Amerigroup and UHC at the BCBST office in Chattanooga for one of these working group meetings in which they discussed and adopted similar reimbursement policies on allergy testing and immunotherapy claims submitted by primary care physicians known to be in contract with UAS. While they all agreed to fix prices for allergen immunotherapy at a set amount of units, at the time only Amerigroup was willing to completely exclude all allergy skin testing or immunotherapy at the primary care level.

**Amerigroup Continues to Work with AASC to Convince BlueCare and BCBST to Join Them in Driving Plaintiffs Out of the Allergy Testing and Immunotherapy Market**

48. While Mr. Taylor was meeting with Amerigroup's competitors in the Fall of 2016, Dr. Mahler continued to coordinate on Amerigroup's behalf through several additional meetings and phone conferences with Mr. DeLozier of AASC and PME to further discuss how to effectuate their agreement on confining payments of allergy claims to board-certified allergists.

49. Amerigroup internal communications demonstrate that by October 2016, Amerigroup understood that primary care providers were providing this service to patients throughout Tennessee, many of whom would otherwise not be able to receive this care without having to travel long distances to see a specialist. Despite understanding that such a decision would risk shutting off necessary allergy care to numerous Amerigroup members and in some cases deprive entire regions of access to such care, Amerigroup continued to try to find ways to stop reimbursement of these providers. These methods included again publication of suggestions that primary care physicians were engaged in "inappropriate" or fraudulent billing that originated from Mr. DeLozier. Specifically, Mr. DeLozier and Dr. Mahler falsely claimed that physicians in contract with UAS were engaged in fraudulent billing because an allergist was not performing the "supervision," or that the level of supervision did not rise to the "personal" versus "direct" level that is necessary to provide the services. This theory directly contradicts CMS's regulatory guidance, but that did not stop Amerigroup from falsely using the argument to coerce primary care providers and to defend its illegal conduct to TennCare. Amerigroup took the position that based on this misrepresented level of supervision, the services at issue were being provided by a technician, not the physician, contrary to the law. Based on that faulty premise, Amerigroup asserted the technician was not credentialed in violation of TennCare requirements. Amerigroup then chose to institute a "prepayment review" on primary care providers' claims with the foregone conclusion that it would deny the claims even after medical records were submitted.

50. Amerigroup did not act out of some concern over a hyper-technical reading of its contract or TennCare requirements, nor was it concerned with the standard of care or the quality of primary care physicians' services. Rather, it was about Amerigroup making the money it would pocket by paying out less in claims than it took in from TennCare, as Amerigroup is paid on a per capita

basis—meaning the more Amerigroup reimburses, the less it makes. Amerigroup and other MCOs are paid on a schedule of per member per month ("PMPM") that is set annually by TennCare based on prior payment history and estimates submitted by Amerigroup to TennCare. When Amerigroup noticed that it would be paying out more PMPM from 2016 through present than it had sought from TennCare based on a lawful expansion of access to allergy care for its members, it tried to determine how to eliminate that risk. Consequently, when Amerigroup investigators communicated with each other on how to deny claims for primary care providers in contract with UAS, one investigator stated that they needed a medical director to suggest issues with the medicine. And when that medical director "did not want to do it," the problem was they "didn't know if they would appoint a different Medical Director to do it or not."

51. When Amerigroup realized that it might not have a medical director to uphold its anticompetitive decisions, it turned again to DeLozier, AASC, and PME. On January 3, 2017, Mr. DeLozier met with Dr. Mahler in Amerigroup's corporate office to see if he could offer a medical basis for Amerigroup to continue denying claims. During that meeting, Mr. DeLozier went over "medical records" belonging to primary care physicians he claimed were practicing allergy testing and immunotherapy. Mr. DeLozier told Dr. Mahler that he could rely on the records and the representations of allergists from AASC to assert that primary care physicians who were in contract with companies such as UAS were supplying medically unnecessary care. Dr. Mahler took notes from Mr. DeLozier on what the documents supposedly meant. The documents themselves contained pricing information of Amerigroup's competitors for these services, including BlueCare and UHC.

52. On January 6, 2017, Dr. Mahler invited Mr. DeLozier to share his ideas on driving primary care physicians out of the allergy testing and immunotherapy services markets at an upcoming

joint meeting with Amerigroup's competitors, UHC and BlueCare. Following that call, Amerigroup set out to explore alternative bases to deny primary care physicians' allergy claims.

53. On January 17, 2017, Dr. Mahler sent the notes and materials from his meeting with Mr. DeLozier to Mr. Taylor via email to further his investigation and provide a basis for denial of claims of primary care physicians contracting with UAS. Dr. Mahler also stated in the same email, in which Mr. DeLozier was copied, "Please connect with Mr. DeLozier. Let me know how I can support elimination of inappropriate allergy services in our network." Mr. DeLozier responded to the email stating "I would be happy to discuss," and Taylor and DeLozier set up a time in early February to discuss. Based on the context of their correspondence, the phrase "inappropriate allergy services in our network" clearly referred to primary care physicians contracting with UAS that the parties had previously agreed should be boycotted for their mutual benefit.

54. Meanwhile, Mr. Taylor distributed the confidential patient records of other competitors provided by Mr. DeLozier internally throughout Amerigroup, including to Rhonda Garrard, a senior provider auditor in Amerigroup's SIU. After reviewing the patient records, Garrard informed Taylor that the charts "have the same documentation as the other [UAS] providers so I would venture to say they are using them as well. I can't say about the others but they might be worth looking into…" At this time Amerigroup was attempting to identify any other primary care physicians working with UAS to discontinue paying for their services in order to drive them from the market, and Mr. DeLozier helped in this effort by sending records to uncover the identities of those primary care physicians.

55. On February 10, 2017, Amerigroup held another conference call with Mr. Taylor, Dr. Mahler, Dr. Alfaro, and others regarding Amerigroup's investigations of primary care providers in contract with UAS and to further discuss determining if Amerigroup could assert any basis to

deny the claims, including materials previously provided by Mr. DeLozier. Amerigroup's reason to do so, which is evident from numerous emails on the subject, is that it stood to recover more than $1,000,000 per year by taking such a position, a figure it later increased to $6,000,000.

56.  For example, the next week, on February 15, 2017, Taylor updated Mahler stating that "SIU now has 17 immunotherapy investigations. Out of 115 suspect providers identified, these 17 account for approximately $567K of the estimated $1.07 million in 95165/95004 Medicaid exposure over the last 13 months." Mahler thanked Taylor, and Taylor clarified that he needed to run individual reports for select providers to determine Medicaid exposure. He noted that they already had 10 open investigations of primary care physicians in contract with UAS. Taylor also noted that they would have a follow-up meeting with Delozier "in the near future."

57.  That same week, Mr. Taylor and another Amerigroup investigator, Shelly Williamson, held a conference call with Mr. DeLozier, which emails suggest were about these "allergy cases" and the materials Mr. DeLozier provided. These investigators took notes of the call, but on information and belief Amerigroup destroyed the notes upon deciding these notes would reveal its liability. Following the call, Mr. Taylor asserted multiple times that the physicians at issue could not provide allergy testing or immunotherapy services because it was "outside the scope of their practice" and was fraudulent.

58. On February 16, 2017, TennCare investigator Annette Dreifke and Mr. Taylor communicated regarding primary care providers in contract with UAS, and stated that she wanted to move one provider "quickly to law enforcement." Mr. Taylor again responded that Amerigroup had paid over a million dollars for approximately 115 providers who Mr. Taylor falsely stated were "practicing outside the scope of their license."

59. On March 8, 2017, the Tennessee Provider Network Workgroup met to discuss primary care providers providing allergy care while in contract with UAS. Kimberly Weakley-Johnson and Carvin Vaughn of Amerigroup gave the presentation. During the presentation, Amerigroup falsely stated that primary care providers practicing these services are at risk from a "quality standpoint" as these services are not being performed by an allergist. During that same meeting, TennCare informed Amerigroup that it was concerned about in-network deficiencies, as Amerigroup as an MCO must have a sufficient network of providers for its members.

60. On March 10, 2017, Amerigroup met yet again internally about how to terminate the numerous primary care physician contracting with UAS from the network to ensure they would not offer allergy testing and immunotherapy services. Internal network reviews of the effects of those terminations showed they could not do so and uphold their TennCare-mandated network adequacy requirements if scrutinized. Eventually, Amerigroup decided to wait to terminate UAS-contracted providers from the Amerigroup network "until after [the Tennessee] legislative session had closed" because it did not want governmental scrutiny of its secret decision to start terminating these physicians.

61. Meanwhile, separate and apart from the Provider Network Workgroup meetings in which the managed care organization competitors discussed reimbursement and how to exclude primary care physicians from the market, the medical directors of the managed care organizations continued to communicate. On April 5, 2017, Mr. DeLozier emailed Dr. Mahler regarding an upcoming meeting that Dr. Mahler would have with Dr. Joel Bradley, the medical director at United Healthcare of Tennessee, and Dr. Jeanne James of BCBST. Mr. DeLozier referred to the meeting as an "opportunity to connect the dots on the asthma and immunotherapy discussions."

25

62. In April 2017, Amerigroup held a Provider Network Workgroup meeting for Amerigroup Tennessee representatives, including executive-level representatives at Amerigroup Tennessee, and discussed the "UAS Provider Termination" issue. The discussion centered on primary care physicians offering these services and the established internal workgroup created after numerous investigations had been initiated. But the notes of the meeting highlight that the "decision not to make determination until after legislative decision closed," emphasizing that Amerigroup feared blowback from state legislators if they terminated primary care physicians while the legislature was in session. Also included in the minutes of the workgroup meeting were notes regarding Dr. Mahler and his review of this issue, including that "Dr. Mahler has been reviewing for one year and treatment is 'inappropriate,'" as well as notes that "allergists joined Dr. Mahler fielded specific documents, escalated it and got involved in contracting." Amerigroup relied on the information received from Mr. DeLozier and AASC to exclude primary care physicians in contract with UAS from the market for allergy testing and immunotherapy.

63. The next month in May 2017, Mr. DeLozier again communicated with Dr. Mahler about more examples that he would need to pull following a call with an individual in Chattanooga, where BCBST is located. Mr. DeLozier asked Dr. Mahler for the individual's email address following their call, as he was "pulling examples for her review."

64. At the next Tennessee Provider Network Workgroup, Amerigroup falsely stated again that UAS technicians, rather than the primary care physicians, were performing all of the services—in contradiction to the many statements made by those providers who had been interviewed and interrogated by Mr. Taylor and other investigators. Despite Amerigroup's repeated pleas, however, on June 19, 2017, TennCare ultimately decided that "[t]he state will be taking no further action into this matter at this time." Until recently, Amerigroup abided by TennCare's direction

that TennCare did not interpret the relationship between providers and UAS to violate any requirements of TennCare at least as it applied to providers with whom Amerigroup was not already in a dispute.

65. When TennCare refused to adopt Amerigroup's flawed position, Amerigroup ramped up its prior failed efforts to convince its competitors to stop reimbursement of primary care physicians offering allergy-related services to their patients. Amerigroup also knew that its efforts, even with the participation of AASC, would not be as effective if Amerigroup's two comptitors did not join in the boycott. For one, Amerigroup could not explain why its argument that State regulations required the boycott, when the other two MCOs regulated by the State still paid for the services. Moreover, the services were still economically viable in some primary care platforms as long as other MCOs continued to pay. Thus, on September 29, 2017, Mr. Taylor called BCBST, stating that he was aware that BCBST had received information from TennCare on primary care physicians offering allergy testing and allergen immunotherapy and asked what BCBST planned to do regarding reimbursement and investigations. BCBST informed Taylor that at that time BCBST had not yet taken any action.

66. A few days later, Amerigroup again contacted BCBST to try to get them to change their policy to exclude primary care physicians from allergy testing and allergen immunotherapy. On October 3, 2017, a representative from BCBST spoke with David Locke, BCBST's Vice President of State Government Relations, asking about BCBST's position on proposed legislation prohibiting insurance carriers from denying payment for preventative and diagnostic services provided by primary care providers or through a provider's supervision of auxiliary personnel (HB 1091/SB 697). The representative apprised Mr. Locke of the legislation and inquired about the source, and Locke responded that an Amerigroup lobbyist asked Mr. Locke about its investigation

and reimbursement policies. Locke described the Amerigroup lobbyists' efforts as "looking for cover."

67. A few months later, on January 9, 2018, Amerigroup and its competitors again spoke through the TennCare OPI about provider networks and who would be able to bill for allergy testing and allergen immunotherapy. Jarrod Webb of TennCare participated in the phone conference and encouraged the MCOs to "provide targeted education" through the provider networks to make sure "that excluded providers are not coming in through the backdoor." Nevertheless, Amerigroup did not take any action at that time because it was currently engaged in discovery in a case brought against it by a UAS-contracted provider, Dr. Sewell, and it calculated that any action against other providers could result in additional plaintiffs and claims in that case. *See C.S. Sewell, M.D. P.C. and Christopher Sewell, M.D. v. Amerigroup Tennessee, Inc.*, Case No. 2:17-cv-00062 (M.D. Tenn. Sept. 22, 2017).

68. Following these discussions, these MCOs met again under the auspices of a "pilot program" in which managed care organizations could meet with each other to discuss the issue. The meeting was held on Monday, May 14, 2018 and included attendees from each managed care organization. From UHC, medical director Joel Bradley, Frances Garner, Ute Strand, Kane Duncan, and Samantha Smith attended. From Amerigroup, medical director Mark Mahler, Carvin Vaughn, and outside lobbyist and attorney Tom Lee attended. From BlueCare and BCBST, Angie Dobbins, Christy Wallace, Amber Casteel, Bridget Gibson, and Cy Huffman attended. At the meeting, representatives from each managed care organization spoke on their current policy of reimbursement for allergy testing and immunotherapy and all attendees compared how best to move forward with reimbursement decisions.

69. Following the meeting, BCBST, BlueCare and Amerigroup agreed they would no longer pay for allergy testing and immunotherapy services provided at the primary care level and would use the discussions they had about guidelines as the basis to do so. For example, their joint discussions included the Milliman Care Guidelines, practice guidelines of board-certified allergist trade associations, and to either require prior authorizations for immunotherapy or restrict self-administration of immunotherapy. Despite knowing that services provided by Plaintiffs met or exceeded the standard of care, BCBST, BlueCare and Amerigroup determined they could coerce physicians to end their relationships with UAS by sending them threats of recoupment as a method of intimidation or by improperly suggesting that UAS's involvement was somehow not permitted. And beginning in July 2018, the competitors began to execute on this plan.

70. For example, on July 31, 2018, Amerigroup sent a recoupment letter to a provider contracting with UAS, Jimmy Cheeks, NP, and his clinic, Mt. Juliet Family Care, accusing Mt. Juliet of entering into a "subcontract" with UAS and requesting repayment of every clean claim that Amerigroup had paid to Mt. Juliet related to allergy care from February 2015 until December 2016—a total of $74,040.99. Mt. Juliet appealed the denial and TennCare did not approve the recoupment. Amerigroup's stated basis for seeking recoupment, the existence of a "subcontract," was ironically suggested by DeLozier even though AASC provides technicians to primary care offices. As the pretextual theory went, if a physician relies on a technician leased by another entity, the lease is a subcontract of the physician's services, which even DeLozier has admitted is false.

71. On August 20, 2018, Amerigroup sent another UAS-contracted clinic, Grace Pediatrics, a recoupment letter stating that its contract with UAS was an unauthorized subcontract in violation of Grace Pediatrics' Provider Service Agreement. The letter also stated that Amerigroup sought and received additional guidance from TennCare about such contracts with UAS and that

TennCare "stated definitively that [the UAS] contracts are subcontracts subject to [TennCare] and Amerigroup approval." This statement was clearly false, as TennCare did not require Amerigroup to deny claims submitted by physicians contracting with UAS. On the contrary, when Amerigroup repeatedly sought TennCare's assistance, TennCare refused to take action on this issue. In addition, Amerigroup's rationale is clearly erroneous, as UAS only provides technician services and the Provider Service Agreement's definition of "Contracted Provider" is limited to physicians and health care providers that offer professional services. Regardless, Amerigroup relied on this false and erroneous pretext in demanding that Grace Pediatrics repay every dollar that Amerigroup had reimbursed for allergy care provided by the clinic's physicians.

72.    Amerigroup subsequently sent yet another clinic a similar recoupment letter, stating that Westmoreland Family Clinic's contract with UAS was an unauthorized subcontract in violation of Westmoreland's Participating Provider Agreement and demanding that Westmoreland repay every dollar that Amerigroup had reimbursed Westmoreland for the allergy care provided to patients from January 2015 through April 2018—a total of $46,229.32. Amerigroup's efforts were unsuccessful because Westmoreland appealed the improper denial and Amerigroup could not recoup without TennCare's approval.

73.    Amerigroup, BCBST, and BlueCare continued to speak and met again in November 2018 to reaffirm their agreement not to pay for services originating from the primary care level. Part of the agreement was to coerce the physicians involved by requiring prior authorization for immunotherapy administered outside of the office, or self-administration, "based on the practice parameters of the Academy of Allergy, Asthma & Immunology," or the AAAAI. The AAAAI is a trade association that represents the interests of board-certified allergists, like AASC. During their meetings, Mr. DeLozier sent Dr. Mahler information from the AAAAI claiming that such

information provided the "standard of care" for allergy. Dr. Mahler also stated that the workgroup excluded food allergies, only concentrating on seasonal and perennial allergies—the only services that primary care physicians in contract with UAS offer to their patients.

74. By December 2018, with this agreement in place, BCBST audited and sent recoupment letters to three primary care clinics contracted with UAS—Cordova Pediatrics PLLC, Putnam County Pediatrics PLC, and Priority Care LLC—all of which serve Tennessee communities. These recoupments amount to thousands of dollars lost per provider, and all result from Mr. DeLozier's and Amerigroup's wrongful attempts to stifle competition and improve their bottom line. That same month, BCBST also sent audit reports falsely stating that such services were not medically necessary per the Milliman Care Guidelines.  Though BCBST had never previously mentioned the Milliman Care Guidelines during the years it paid for such claims billed by primary care physicians in contract with UAS, following the workgroup and agreement with Amerigroup, it now relies on an intentional misapplication of these guidelines to restrict allergy care.

75. In January 2019, BCBST continued to send recoupment notices to primary care physicians known to be in contract with UAS, stating that allergy testing and immunotherapy services were being denied and recouped because they were "not medically necessary" as determined by BCBST's Medical Director or that the services were performed by an "ineligible provider" through the allergy technician. These recoupment, overpayment, and audit findings from BCBST concerned over 100 patients in rural Tennessee where allergy testing and immunotherapy services are not otherwise available to these patients.

76. Around the same time, on January 29, 2019, an Amerigroup investigator contacted Steel Family Medicine Clinic in Pleasant View, Tennessee, stating that the clinic should cease its allergy testing and immunotherapy practice, because UAS is not in contract with Amerigroup, and

Amerigroup will not pay any of the claims. In March 2019, BCBST initiated recoupment of the claims for these primary care physicians. BCBST recouped from one such primary care provider in Livingston, Tennessee, a rural town with only 3,500 residents, for thousands of dollars in allergy services.

77. BCBST also issued a "Blue Alert" notice in March 2019 that included an "Allergy Immunotherapy Reimbursement Update," stating that the commercial health plan reimbursement policy would change as of April 1, 2019 to reimburse an annual limit of up to 160 doses per patient, per year. Previously, immunotherapy was limited to not exceed 30 doses a day—and BCBST changed this policy following the agreement made with Amerigroup and others at the TennCare workgroup meeting. That same month, Amerigroup denied claims of Dr. Christopher Sewell, a plaintiff in another action against Amerigroup, for allergy testing and immunotherapy claims even after Amerigroup admitted to Dr. Sewell and UAS that its prior pretextual basis for denial—the existence of a supposed "subcontract relationship" between UAS and Dr. Sewell, was not a proper basis to deny claims. Instead, at that time Amerigroup just made up a different basis for denial— that the patient was not a patient of Dr. Sewell's—which Amerigroup knew to be false.

78. Because Amerigroup knew it had to announce something given the bases for its prior denials were disproven and rejected by TennCare, and to further carry out its agreement with Defendants, Amerigroup sent a fax notice to all managed care providers on May 16, 2019 announcing new grounds Amerigroup now intends to use to prohibit claims at the primary care level, including adoption of allergists-only guidelines agreed to with Defendants. For example, the policy, announced to become effective July 1, 2019, states that providers must follow the private allergist practice guidelines of the American College of Allergy, Asthma, and Immunology, Joint Council of Allergy, Asthma, and Immunology, and Joint Task Force on Practice Parameters

of the American Academy of Allergy, Asthma, and Immunology as previously discussed and agreed to with AASC, PME, and DeLozier as a basis to exclude providers who are not board-certified allergists. Amerigroup also fixed prices at the reimbursement level of 150 doses/units per member per calendar year with a 3-month supply reimbursement restriction as previously discussed and agreed to with BCBST and BlueCare. Amerigroup's announcement also adopts the Milliman Care Guidelines that Amerigroup, BCBST, and BlueCare agreed they would misuse and misapply to audit and deny claims. And Amerigroup's announcement also explicitly states that "except for rare exceptions," administration of allergen immunotherapy should occur in a medical facility as a basis to harass providers acting within the standard of care knowing that self-administration is a more common practice at the primary care level.

79. These recently announced changes of BCBST, BlueCare, and Amerigroup represent those agreements formed among all Defendants over a period of several months to fix prices and boycott competition at the primary care level and are a tool Defendants have already used to coerce providers to deny relationships with UAS that are necessary to both in the competitive struggle. For example, each of BCBST, BlueCare, and Amerigroup have used these grounds, even before they were announced, as improper bases for audits, prepayment reviews, claims denials, and recoupments because they understand such tactics intimidate providers from further working with UAS. Each of BCBST, BlueCare, and Amerigroup track internally within their investigations departments how much money they expect to save and the investigators are reviewed and compensated based on those calculations and the investigators' effectiveness in deterring claims or denying or recouping reimbursements. Further, Defendants have already agreed if providers continue to work with UAS, Amerigroup, BCBST, and BlueCare will continue to use the private allergist and Milliman Care guidelines discussed above to falsely uphold the denials of claims even

though Defendants already know the services meet the standard of care. Defendants are aware that the cost of appealing and contesting claims denials by Plaintiffs and providers often exceed any benefit of doing so and the threat of recoupment and network termination in retaliation has been effective at dissuading providers from working with UAS. To date Amerigroup, BlueCare, and BCBST have already followed through with Defendants' agreement regarding certain providers by repeatedly falsely claiming the services provided do not meet those private guidelines and have plans to harass all primary care providers throughout the State.

80. As a result, providers throughout Tennessee face two of the three MCOs threatening their existence if they do not exit the market, and BCBST's medical director and investigators in particular appear intent on leading the charge that Amerigroup, AASC, PME, and DeLozier have generated. Defendants continue their overt acts in furtherance of their conspiracy to exclude primary care from the market for allergy testing and immunotherapy. Primary care physicians, AAAPC members, and UAS are being forced out of the market because Defendants want to allow AASC, PME, and DeLozier to offer these services without competition from this class of competitors and permit managed care organizations and BCBST to avoid paying for these additional services.

**Defendants' Conduct Damages the Market, Provider Plaintiffs, Their Practices, UAS, AAAPC and Consumers**

81. The effect of Defendants' conduct has taken a toll on AAAPC members' practices and UAS, who cannot offer allergy testing or immunotherapy services for both fear of retaliation and because Amerigroup and BCBST appear primed to accept services but not pay for them. As a result, AAAPC member providers' patient populations, including those of Amerigroup and

BCBST patients, have dwindled. Further, these member providers have not been reimbursed for services for which they spent significant resources.

82. Further, Amerigroup's, BCBST's and BlueCare's successful efforts to involve competitors has also threatened AAAPC member providers' practices, as they rely on their reimbursement as well. Without health insurance reimbursement for Medicaid patients, AAAPC member providers could not maintain viable medical practices, and consumers would have no options for all services in the area.

83. UAS has also been harmed as direct result of Defendants' actions. UAS has lost revenue and corresponding profits that it would have generated but for the actions of Defendants. Certain clinics that contract with UAS have terminated their contracts because of Defendants' harassment. UAS has also been forced to expend substantial resources to ensure that those it does business with do not terminate existing agreements, and has also experienced difficulty in entering into business relationships with others because of Defendants' anticompetitive policies excluding them from the market. UAS's lost revenue and profits are determined both by a decrease in services to existing contractual relationships with physicians and a loss of expected revenue and profit from new contracts that did not materialize.

84. In addition to UAS's business, competition and consumers have also been harmed and continue to be harmed. Plaintiffs and their contracted primary care practices are the only available alternative for certain healthcare necessary services in markets throughout Tennessee for some patients, including allergy testing and immunotherapy. Patients who cannot access these services through Plaintiffs often have no alternative because any other provider of allergy services is too far away, even though the some of the patients such as asthmatics and severe allergy sufferers, are at high risk of more debilitating consequences from not receiving treatment. As TennCare and

CMS regulations observe, travel of more than 25 miles for such primary services is considered outside the bounds of the appropriate area. In any event, requiring patients to travel long distances up to 50 miles to another city cannot be considered reasonable access to care or the reasonable distance in which a consumer can be expected to access these services.

85. For example, Amerigroup, BCBST, and BlueCare's decisions to pay only board-certified allergists renders allergy testing and immunotherapy infeasible to most patients in the relevant geographic market, as many patients do not have allergists in their communities or even surrounding communities. Most consumers will not travel 100-200 miles round trip for these services, especially considering that allergen immunotherapy is an ongoing treatment administered over the course of 3-5 years. The consumers who are able to travel for services face a significant burden in additional costs, including additional travel distance, wait time for an appointment, wait time in the office, and time off from work and school.

86. While Amerigroup, BCBST, and BlueCare have yet to terminate certain AAAPC members from their networks as they have threatened, they have effectively used this threat as coercion to run Plaintiffs out of the market and leave a void in Tennessee markets in terms of network adequacy under the TennCare program.

## CLAIM ONE – SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS
### (By All Plaintiffs Against All Defendants)

87. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

88. At all times relevant to the Complaint, Defendants have combined, conspired, or attempted to combine and conspire with their competitors as well as with competitors of Plaintiffs, including MCOs and board-certified allergists, to restrict competition for allergy testing and immunotherapy services in local markets within Tennessee, including the following CBSA markets: Athens, Clarksville, Columbia, Cookeville, Crossville, Franklin, Greeneville, Harriman,

Hendersonville, Hermitage, Johnson City, Knoxville, Lawrenceburg, Lenoir City, Madisonville, Maryville, McMinnville, Morristown, Mt. Juliet, Oak Ridge, Sevierville, Spring Hill, West Nashville, and White House. Defendants' actions include restricting participation in the market for all allergy testing and immunotherapy services provided by businesses other than those of board-certified allergists. In furtherance of their conspiracy, Defendants have agreed among themselves to engage in a coordinated campaign to boycott Plaintiffs and primary care physicians to drive them from the market. The campaign has included joint decisions among insurance companies, MCOs, and businesses associated with board-certified allergists to restrict payment for allergy skin testing and immunotherapy services at the primary care level, including by falsely suggesting those services are "inappropriate," substandard, or fraudulent. Defendants have also attempted to coerce primary care physicians out of the market by falsely suggesting they are engaged in fraud or substandard care, and have attempted to push governmental investigators into commencing false investigations to increase the appearance of that threat. In furtherance of their actual and threatened conspiracies and illegal agreements, Defendants have communicated with competitor insurance companies, MCOs, board-certified allergists, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Plaintiffs, or to fix prices to competitively disadvantage them to discourage competition in the market.

89. This conduct is considered illegal *per se* because such horizontal agreements threaten to successfully eliminate and restrict sources of output in the relevant market. Amerigroup and BlueCare are horizontal competitors in Tennessee. Moreover, AASC holds a dominant position in the market for allergy testing and immunotherapy services in Tennessee and BCBST holds a dominant position in the insurance markets in Tennessee. Defendants' conspiracy and attempt at conspiracy seeks joint collaborative action to destroy legitimate competition in the market by

encouraging a group boycott and fixing prices in an effort to drive Plaintiffs and the class of competitors they represent out of the market. By refusing to pay anything for allergy testing and immunotherapy services and coercing primary care physicians to deny relationships to UAS to shut off output, Defendants seek to deny Plaintiffs the ability to compete in the market. Defendants also seek to cut off any technical capabilities of physicians to compete in the relevant market, including access to technical services and relationships necessary for allergy testing and immunotherapy including agreements between primary care physicians and entities such as UAS. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so Defendants should not escape a *per se* designation.

90. Strictly in the alternative to a *per se* designation, Defendants' anticompetitive actions support an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements Defendants have sought, entered, maintained, renewed and enforced have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy in the relevant market. As the result of Defendants' conduct, consumers have been deprived of the competition facilitated by Plaintiffs' participation in the relevant market, leaving many consumers with less access to care, lower output, and higher prices.

91. Defendants' conspiracy to eliminate Plaintiffs from the markets for allergy testing and immunotherapy services has involved numerous acts in furtherance of their antitrust conspiracy, including the joint decisions to deny reimbursement for any and all claims through the present and to seek recoupment for previously paid claims, including claims recently paid and on an ongoing basis.

92. As a direct and proximate result of Defendants' past and continuing violations of the Sherman Act, UAS has suffered injury and damages in an amount to be proved at trial. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

93. Plaintiffs also seek injunctive relief. The violations set forth above are continuing, are causing irreparable harm, and will continue unless injunctive relief is granted.

94. Plaintiffs also seek recovery of their attorneys' fees and costs under the Clayton Act as a remedy for the costs they have incurred as a result of Defendants' conduct.

## CLAIM TWO – SHERMAN ACT § 2 VIOLATION AGAINST ALL DEFENDANTS

**(By All Plaintiffs Against AASC for Willful Acquisition and Maintenance of a Monopoly and Attempt to Monopolize in the Relevant Market and Against All Defendants for Conspiracy to Monopolize the Relevant Market in Violation of Sherman Act, Section 2)**

95. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

96. AASC has market power in local markets within Tennessee in the allergy testing and immunotherapy services market and monopoly power in certain localized markets. This monopoly power is evidenced by, among other things, AASC being the sole or only non-UAS-contracting provider option for the pertinent allergy services in various CBSAs in Tennessee and its increasing market share as providers in contract with UAS are driven from those markets, and as Plaintiffs have been and continue to be by AASC and its co-Defendants' conduct.

97. For example, in certain localized markets, such as Lawrenceburg, AASC is the only provider of the pertinent allergy skin testing and immunotherapy services. In other localized markets, AASC has a supermajority share of the market. For example, AASC has over 70% market share in Cookeville where UAS and primary care provider Kids Kare jointly offer allergy testing and immunotherapy services in that market in direct competition with AASC, which until recently was the only source of output in that area. But AASC still treats the supermajority of patients in

that market, and its efforts complained of herein are designed to increase its monopoly power or attempt to regain that power to the extent competition by Plaintiffs has threatened such power.

98.    At all times relevant to the Complaint, Defendants have combined and conspired amongst themselves and with competitors of Plaintiffs to eliminate competition in the markets for allergy skin testing and immunotherapy services for patients in Tennessee.  These activities include efforts at the primary care level to maintain, enhance and solidify AASC's monopoly over the allergy testing and immunotherapy services market in local markets without losing market share to AASC's competitors, such as Plaintiffs.

99.    Defendants' actions include attempting to restrict and in fact restricting participation in the market for all allergy testing and immunotherapy services provided by businesses other than those of board-certified allergists.  In furtherance of their conspiracy, Defendants have agreed among themselves to engage in a coordinated campaign to boycott Plaintiffs to drive them from the market.  The campaign has included joint decisions with other MCOs and allergists to restrict payment for allergy skin testing and immunotherapy services at the primary care level, including by falsely suggesting those services are "inappropriate," substandard, or fraudulent. Defendants have also attempted to coerce primary care physicians out of the market by falsely suggesting they are engaged in fraud or substandard care and have attempted to push governmental investigators into false investigations to increase the appearance of that threat. In furtherance of their actual and threatened conspiracies and illegal agreements, Defendants have engaged in contact with competitor insurance companies, MCOs, board-certified allergists, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Plaintiffs or other primary care physicians, or to fix prices to competitively disadvantage them to discourage competition in the market.

100. Defendants' conspiracy to eliminate Plaintiffs and other primary care physicians from the markets for allergy testing and immunotherapy services has involved numerous acts in furtherance of their antitrust conspiracy, including Defendants' concerted decision to deny reimbursement for claims by UAS-contracting providers through the present and to seek recoupment for previously paid claims, including recently and on an ongoing basis.

101. Defendants have abused and continue to abuse AASC's monopoly power to maintain and enhance AASC's market dominance by unreasonably restraining trade and output, fixing prices for allergy testing and allergen immunotherapy, and artificially inflating the premiums Amerigroup charged and charges to consumers while providing fewer services than Defendants' actual and potential competitors.

102. Each of the Defendants' conspiracies and agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to maintaining and enlarging AASC's market power through CBSAs in Tennessee; allowing AASC to supra-competitively raise the prices charged to consumers by inflated, unreasonable, anticompetitive amounts; and, depriving Plaintiffs and consumers in Tennessee open and free competition for allergy testing and allergen immunotherapy – and for many consumers, depriving them of any ability to receive care at all.

103. In exchange for agreeing on certain reimbursement prices and policies with AASC, Amerigroup has been able to limit its financial exposure to claims and other reimbursement and benefits it otherwise would be obligated to provide to consumers and primary care providers, and thus pocket money illegally and disrupt the natural flow of output and price that occurs in competition.

104. If it continues to be successful in its anticompetitive efforts, AASC would have a dangerous probability of maintaining or regaining its monopoly power in localized markets as it has and would continue to eliminate the competition and the competition's ability to grow, thereby cementing AASC's monopoly power in markets such as Cookeville and Lawrenceburg. AASC's conduct was undertaken with a specific intent to maintain, enhance, regain, and/or solidify its monopoly in such localized markets, as it is specifically aiming to eliminate its primary competition so it can reap the benefits as a monopolist.

105. Defendants' conduct constitutes unlawful monopolization, attempted monopolization, conspiracy to monopolize, and unlawful anticompetitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

106. As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and consumers have suffered injury and damages in an amount to be proven at trial. UAS seeks money damages from the Defendants for their violations of Section 2 of the Sherman Act. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

107. Plaintiffs also seek injunctive relief. The violations set forth above are continuing, are causing irreparable harm, and will continue unless injunctive relief is granted.

108. Plaintiffs also seek recovery of their attorneys' fees under the Clayton Act as a remedy for the costs they have incurred as a result of Defendants' conduct.

## CLAIM THREE – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (By All UAS Against All Defendants)

109. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

110. Defendants' conduct described herein constitutes tortious interference with the existing agreements between UAS and its many physicians and practice groups. Defendants' conduct, which was neither justified nor privileged, was intended to cause other MCOs, practice groups, and patients to cease their agreements or doing business with primary care physicians, including Plaintiffs, and to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS. Defendants' conduct constitutes willful and intentional acts of interference with those agreements and was done with malice and knowledge of the underlying contracts at issue. Such conduct caused injury to UAS by, among other things, reducing business under UAS's agreements with primary care physicians, causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for UAS and those with whom it contracts to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Defendants' actions.

## CLAIM FOUR – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR ADVANTAGE
### (By UAS Against All Defendants)

111. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

112. Defendants' conduct described herein constitutes tortious interference with the business relationships between UAS and its customers, as well as third parties with whom Defendants know UAS to be in a relationship, including Defendants' competitors. Defendants' conduct, which was neither justified nor privileged, was intended to cause those third parties to cease their agreements with UAS or reduce performance or business with UAS. Defendants' conduct constitutes willful and intentional acts of interference with those relationships and was done with malice and specific knowledge of the underlying relationships and contracts at issue and by improper means. Such

conduct caused injury to UAS by, among other things, reducing business under UAS's agreements and business relations causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for UAS and its customers to conduct their operations and business.

113. In addition, Defendants' conduct described herein constitutes tortious interference with UAS's existing and prospective business relations. There was a reasonable probability that, absent Defendants' actions, UAS would have maintained existing relationships and entered into additional business relationships with third parties, including other physicians and practice groups. Defendants intentionally interfered with these relationships by attempting to prevent payment to physicians who are assisted and supported by UAS, to scare physicians and practice groups away from maintaining relationships with or entering into business with UAS. Defendants' conduct constitutes willful and intentional acts of interference and was done with malice and knowledge of UAS's existing and prospective business relationships. Defendants' conduct was independently tortious or unlawful for the reasons described herein, including for violating and encouraging and participating with others in violating antitrust laws, making false, fraudulent, defamatory, and disparaging statements regarding UAS, and participating in a breach of statutory and contractual duties between Amerigroup and individual providers, AAAPC members, and UAS contracting physicians. Defendants' interference proximately caused injury to UAS by, among other things, reducing revenue and corresponding profits from UAS's business relationships and making it more difficult to conduct operations and causing UAS to expend considerable resources in order to further its business.

## CLAIM FIVE – CIVIL CONSPIRACY
### (By All Plaintiffs against All Defendants)

114. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

115.   Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to violate the Sherman Act and tortiously interfere with the contracts and current and prospective business relations between UAS and AAAPC members. In furtherance of their conspiracy, Defendants have undertaken efforts to eliminate competition and output of allergy testing and allergen immunotherapy services in which Plaintiffs participate and to coerce physicians and UAS to terminate or reduce performance of their contractual agreements and to exit the market.  As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, UAS has suffered considerable injury to their businesses and their ability to compete in the marketplace. Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

## CLAIM SIX - DECLARATORY JUDGMENT
### (By All Plaintiffs against All Defendants)

116. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

117. A necessary legal determination regarding the conduct of Defendants is whether Defendants' suggestions and actual conduct that allergy testing and immunotherapy services may be restricted by insurance companies and MCOs to board-certified allergists violates the law.

118. Because Amerigroup, BCBST, and BlueCare are statutorily and contractually prohibited from restricting sources of output to the businesses of board-certified allergists on that basis, an actual and justiciable controversy exists.

119. Accordingly, and pursuant to the federal Declaratory Judgment Act, Plaintiffs seek the following declaratory judgment of the legal requirements of Defendants that will assist the ultimate factfinder in determining whether Defendants' conduct was statutorily prescribed or tortious:

   a.   AAAPC members, including family physicians, pediatricians, and other primary care physicians may provide allergy testing and allergen immunotherapy services,

including through the supervision of auxiliary personnel, within the scope of their licenses and certifications as Tennessee providers; and

b. Amerigroup, BCBST, and BlueCare may not discriminate against AAAPC members from providing such services on the basis that they are not board-certified allergists.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

### (Brought by All Plaintiffs against Defendants)

120. All foregoing paragraphs are incorporated by reference as if fully set forth herein.

121. Defendants are violating their statutory duties to ensure access to allergy testing and immunotherapy services and not to discriminate against classes of providers for providing those services.

122. AAAPC members and their patients will suffer immediate and irreparable injury if Defendants are allowed to continue denying allergy services or allowed to continue their efforts to recoup past payments, including interference with their ongoing treatment of patients. Defendants' actions will cause AAAPC members and their patients' immediate and irreparable damage for which there is no adequate remedy at law.

123. Plaintiffs thus request that the Court preliminarily and permanently enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from (i) undertaking efforts to restrict allergy diagnosis, testing, treatment, preparation, and supervision services of Plaintiffs; (ii) seeking to recoup any past payments that were made for services that were provided; and (iii) threatening AAAPC members for providing such services.

## CONDITIONS PRECEDENT

124. All conditions precedent have been performed, have occurred, or have been excused.

## JURY DEMAND

125. Plaintiffs respectfully request that all issues of fact in this case be tried to a properly impaneled jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. That proper process be issued and Defendants be required to answer or otherwise respond to the Complaint within the time permitted by law.

2. That the Court enter a declaratory judgment declaring:

   a. AAAPC members, including family physicians, pediatricians, and other primary care physicians may provide allergy testing and allergen immunotherapy services, including through the supervision of auxiliary personnel, within the scope of their licenses and certifications as Tennessee providers; and

   b. Amerigroup, BCBST, and BlueCare may not discriminate against AAAPC members from providing such services on the basis that they are not board-certified allergists.

3. That UAS have and receive a judgment against Defendants for economic and actual damages in an amount to be proved at trial, to be trebled with interest and all exemplary or punitive damages that may be awarded.

4. That the Court issue a preliminary and permanent injunction enjoining Defendants from (i) undertaking efforts to restrict allergy diagnosis, testing, treatment, preparation, and supervision services of Plaintiffs; (ii) seeking to recoup any past payments that were made for services that were provided; and (iii) threatening AAAPC members for providing such services.

5.    Plaintiffs further pray that the Court enter judgment also finding that Defendants are additionally liable to Plaintiffs for:

a.    Costs of suit;

b.    Prejudgment and post-judgment interest;

c.    Attorney's fees; and

d.    All other relief the Court deems appropriate.


THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY RELIEF


Respectfully submitted,

**BASS, BERRY & SIMS PLC**


*/s/ Paige W. Mills*
Paige W. Mills
Tennessee Bar No. 16218
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Phone: (615) 742-6200
pmills@bassberry.com

Lucas R. Smith
Tennessee Bar No. 027546
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Phone: (615) 742-6200
lsmith@bassberry.com

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:   */s/ Casey Low*
        Casey Low
        Texas Bar No. 24041363
        Dillon J. Ferguson
        Texas Bar No. 06911700
        401 Congress Ave., Suite 1700

48

Austin, Texas 78701
Phone: (512) 580-9600
Fax:     (512) 580-9601
casey.low@pillsburylaw.com
dillon.ferguson@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS**